Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
**ROWLEY LAW PLLC**
50 Main Street, Suite 1000
White Plains, New York 10606
Tele: 914-400-1920
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**JOHN WALSH, derivatively on behalf of JASPER THERAPEUTICS, INC.,**

**Plaintiffs,**

**v.**

**RONALD A. MARTELL, JUDITH SHIZURU, KURT VON EMSTER, CHRISTIAN NOLET, SCOTT BRUN, VISHAL KAPOOR, THOMAS WIGGANS, SVETLANA LUCAS, WILLIAM LIS, ANNA FRENCH, HERBERT C. CROSS, AND EDWIN TUCKER,**

**Defendants,**

**-and-**

**JASPER THERAPEUTICS, INC., a Delaware Corporation,**

**Nominal Defendant.**

**CASE NO.** 3:25-cv-10899

**JURY TRIAL DEMANDED**

**PLAINTIFF'S DERIVATIVE COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**

**(1) Breach of Fiduciary Duty (Derivatively Against the Director Defendants)**
**(2) Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)**
**(3) Gross Mismanagement (Derivatively Against All Defendants)**
**(4) Waste of Corporate Assets (Derivatively Against All Defendants)**

**(5) Unjust Enrichment (Derivatively Against the Officer Defendants)**
**(6) Violations of Section 14(a) of the Exchange Act (Derivatively Against the Director Defendants)**

Plaintiff John Walsh ("Plaintiff"), derivatively on behalf of Jasper Therapeutics, Inc. ("Jasper" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Grant v. Jasper Therapeutics, Inc. et al.*, Case No.: 5:25-cv-08010-BLF (N.D. Cal.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Jasper, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least November 30, 2023, to July 9, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Jasper to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. Jasper, a clinical-stage biotechnology company, focuses on developing therapeutics targeting mast cell driven diseases such as Chronic Spontaneous Urticaria ("CSU"), Chronic Inducible Urticaria ("CIndU"), and Asthma. The Company's lead product candidate is briquilimab, a monoclonal antibody designed to block stem cell

factor ("SCF") from binding to and signaling through the CD117 ("c-Kit") receptor on mast and stem cells. According to Jasper, the "SCF/c-Kit pathway is a survival signal for mast cells and [the Company] believe[s] that blocking this pathway may lead to depletion of these cells throughout the body, including in the lungs and in the skin, which could lead to significant clinical benefit for patients with mast-cell driven diseases such as asthma and chronic urticarias" and "[t]o that end, [Jasper is] focusing on advancing a portfolio of clinical programs in mast cell driven diseases." In 2024, to "strengthen [its] balance sheet and support development of briquilimab," Jasper completed an oversubscribed $50 million financing "with a syndicate of leading life science investors," purportedly "extending [its] cash runway through the third quarter of 2025."

3. In November 2023, the Company commenced a Phase 1b/2a clinical study of subcutaneous briquilimab for the treatment of CSU (the "BEACON Study"). When announcing the first patient dosing in the BEACON Study, Jasper's Chief Executive Officer ("CEO") Defendant Ronald A. Martell ("Martell") stated, in relevant part, that he was "confident in the ability of our clinical organization to continue to execute at a high level as we advance briquilimab into clinical trials in CIndU and other mast cell-driven diseases." In December 2024, the Company commenced a Phase 1b/2a clinical study evaluating briquilimab in allergic asthma (the "ETESIAN Study"). In addition, Jasper has attempted to develop briquilimab as a one-time conditioning therapy for severe combined immunodeficiency ("SCID") patients undergoing a second stem cell transplant.

4. Under the Drug Supply Chain Security Act ("DCSA")—a law enacted by Congress in 2013 designed to improve and ensure the safety of the U.S pharmaceutical supply chain—all prescription drugs must be labeled with a unique product identifier that includes, among other things, a "lot number." Drug "lots" are batches of a product that are manufactured, processed, packaged, or stored under the same conditions. If a

medication is compromised, pharmaceuticals companies can use lot numbers to trace the affected batches and alert healthcare providers.

5. According to the Company, "[t]he manufacture of pharmaceuticals is subject to extensive [current Good Manufacturing Practices ("cGMP")] regulations, which impose various procedural and documentation requirements and govern all areas of record keeping, production processes and controls, personnel and quality control." Because Jasper does not currently own or operate any manufacturing facility, the Company relies on third-party contract manufacturing organizations to produce its drug candidates in purported "accordance with cGMP regulations for use in [its] clinical studies.

6. Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Jasper lacked the controls and procedures necessary to ensure that the third-party manufacturers on which it relied were manufacturing products in full accordance with cGMP regulations and otherwise suitable for use in clinical trials; (ii) the foregoing failure increased the risk that results of ongoing studies would be confounded, thereby negatively impacting the regulatory and commercial prospects of the Company's products, including briquilimab; (iii) the foregoing increased the likelihood of disruptive cost-reduction measures; (iv) accordingly, the Company's business and/or financial prospects, as well as briquilimab's clinical and/or commercial prospects, were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7. On July 7, 2025, Jasper issued a press release reporting updated data from the BEACON Study. The press release stated that "[r]esults from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts appear to be confounded by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with

drug from the lot in question," that "[t]he Company is investigating the drug product lot in question and expects to have the results of that investigation in the coming weeks," and that Jasper was "taking steps to ensure that drug product from the lot in question is returned to the Company and that sites have drug product from other lots to continue dosing." Further, the press release revealed that the Company "has also determined that the drug product lot in question was used to treat participants enrolled in the ETESIAN [Study]. As a result, and in order to focus resources on advancing briquilimab in CSU, the Company is halting the study and pausing development in asthma." Finally, the press release stated that "the Company is halting development in SCID" and, contrary to its prior representation of having a strong balance sheet and a cash runway extending "through the third quarter of 2025," that Jasper "will be implementing a number of other cost cutting measures including a potential restructuring, to extend runway and reduce expenses."

8. On this news, Jasper's stock price fell $3.73 per share, or 55.1%, to close at $3.04 per share on July 7, 2025.

9. Market analysts were quick to comment on the Company's announcement. For example, on July 7, 2025, BMO Capital Markets published a report downgrading Jasper to market perform and lowering its price target from $6.77 per share to $4.00 per share (the "BMO Report"). The BMO Report stated, in relevant part, that "potential Briquilimab drug lot issues, coupled with existing uncertainty around dose-response [], will pressure the [Jasper] story moving forward" given, among other things, Jasper's "financing overhang" and market competition.

10. On July 9, 2025, the Company issued a press release entitled "Jasper Therapeutics Announces Corporate Reorganization and Other Cost Cutting Measures to Extend Cash Runway." The press release revealed that Jasper was reducing its workforce by approximately 50%, that "[i]n order to focus resources on the development of briquilimab in chronic urticaria, Jasper is halting its other clinical and preclinical

programs," and that Defendant Edwin Tucker ("Tucker") was departing his role as the Company's Chief Medical Officer ("CMO") effective August 1, 2025.

11. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

12. Plaintiff John Walsh is a current shareholder of Jasper and has continuously held Jasper stock during all times relevant hereto, and is committed to retaining Jasper shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Jasper and its shareholders in enforcing its rights.

### B. Nominal Defendant

13. Nominal Defendant Jasper is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 2200 Bridge Pkwy, Suite #102, Redwood City, CA 94065.

### C. Individual Defendants

14. Defendant Ronald A. Martell has served as President, CEO and has been a director of the of the Company since 2022.

15. Defendant Judith Shizuru, M.D., Ph.D. has been a director of the Company since 2021.

16. Defendant Kurt von Emster has been a director of the Company since 2021.

17. Defendant Christian Nolet has been a director of the Company since 2021.

18. Defendant Scott Brun, M.D has been a director of the Company since 2023.

19. Defendant Vishal Kapoor has been a director of the Company since 2023.

20. Defendant Thomas Wiggans has been a director (Chairperson of the Board) of the Company since 2023.

21. Defendant Svetlana Lucas, Ph.D. has been a director of the Company since 2024.

22. Defendant William Lis was a director of the Company from 2019 to 2024.

23. Defendant Anna French, Ph. D. was a director of the Company from 2021 to 2024.

24. Defendants Martell, Shizuru, von Emster, Nolet, Brun, Kapoor, Wiggans, Lucas, Lis, and French are herein referred to as "Director Defendants."

25. Defendant Herbert C. Cross has served as Jasper's Chief Financial Officer at all relevant times.

26. Defendant Edwin Tucker served as Jasper's CMO at all relevant times.

27. Defendants Martell, Cross, and Tucker are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

31. Venue is proper in this court under 28 U.S.C. § 1391, because Jasper is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

32. Jasper, a clinical-stage biotechnology company, focuses on developing therapeutics targeting mast cell driven diseases such as CSU, CIndU, and Asthma. The Company's lead product candidate is briquilimab, a monoclonal antibody designed to block SCF 20 from binding to and signaling through the c-Kit receptor on mast and stem cells.

### B. Jasper's False and Misleading Statements

33. From at least November 30, 2023, through July 3, 2025, Jasper and its executive officers and directors made materially false and misleading statements about briquilimab, a monoclonal antibody designed to block SCF 20 from binding to and signaling through the c-Kit receptor on mast and stem cells.

34. On November 30, 2023, the Company issued a press release entitled "Jasper Announces First Patient Dosed in Phase 1b/2a Clinical Study of Briquilimab in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

> "Dosing of the first patient in our BEACON study is an exciting milestone for Jasper as we advance the clinical development of briquilimab in mast cell diseases," said [Defendant] Tucker[.] "In addition to gathering safety data in CSU patients who are ineligible for, or refractory to, omalizumab, we expect the study to establish proof of concept for the depletion of mast cells by briquilimab in CSU. Results from the trial should also allow us to determine doses and dosing regimens for future registrational studies in the broader CSU patient population. We look forward to providing enrollment updates as we progress through the cohorts and anticipate reporting preliminary data in mid-2024."
>
> * * *
>
> "We are pleased to announce that the first patient has been dosed in our BEACON study on a timeline consistent with our prior guidance," said [Defendant] Martell[.] "***Treating the first patient so shortly after IND clearance is a testament to the hard work and diligence that Ed and his team put into the BEACON study's launch and I'm confident in the***

> ***ability of our clinical organization to continue to execute at a high level as we advance briquilimab into clinical trials in CIndU and other mast cell-driven diseases***."[1]

35. On January 5, 2024, Jasper issued a press release "[h]ighlight[ing] [r]ecent [a]ccomplishments and [k]ey [u]pcoming [m]ilestones." The press release stated, in relevant part:

> "2023 was a strategically important year for Jasper," said [Defendant] Martell[.] "We secured IND clearance and CTA authorization for the Phase 1b/2a BEACON study of briquilimab in CSU and successfully dosed the first patient. Additionally, we reported positive data from the Phase 1/2 trial of briquilimab in patients with Fanconi Anemia (FA) along with the final Phase 1 results in patients with acute myeloid leukemia (AML) or myelodysplastic syndromes (MDS) undergoing hematopoietic cell transplant, initiated the LR-MDS Phase 1b trial, and strengthened our leadership team.
>
> Our achievements in 2023 set the stage for a transformational year ahead with multiple key clinical milestones on the horizon across multiple indications. Specifically, we expect to present initial data from the Phase 1b/2a BEACON study in mid-2024, which will provide valuable insight into the therapeutic potential of briquilimab. We also anticipate initiating our Phase 1b/2a SPOTLIGHT study in CIndU following our recently obtained CTA authorization from the EMA, with initial data expected in the second half of the year. Finally, we expect to present data from our Phase 1b LR-MDS study in the first half of 2024."

36. On March 4, 2024, Jasper issued a press release announcing the Company's fiscal 2023 financial results. The press release stated, in relevant part:

> ***"2023 was a highly productive year for Jasper, as we shifted our operational focus toward briquilimab development in mast cell driven diseases,"*** said [Defendant] Martell[.] ***"To that end, we successfully filed and obtained regulatory clearance for our clinical programs in both CSU and CIndU, allowing the launch of our BEACON and SPOTLIGHT clinical trials in chronic urticarias. We also completed an oversubscribed $50 million financing with a syndicate of leading life science investors to strengthen our balance sheet and support development of briquilimab, extending our cash runway through the third quarter of 2025.*** As we enter a transformational and data-rich year for Jasper, we look forward to reporting initial results from our BEACON study in CSU in the third quarter of 2024 and our SPOTLIGHT study in CIndU in the second half of 2024, and expect to initiate a new clinical program in at least one additional mast cell driven indication later this year."

37. On March 5, 2024, Jasper filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended

---

[1] All emphases included herein are added unless otherwise indicated.

December 31, 2023 (the "2023 10-K"). In providing an overview of briquilimab, the 2023 10-K stated, in relevant part:

> We are focused on advancing Briquilimab in development as a chronic therapy in mast cell driven diseases such as CSU, CIndU and other mast cell driven indications currently under evaluation. We also currently have an ongoing study in LR-MDS, as well as a study as a conditioning agent to clear HSCs from the bone marrow prior to re-transplant in patients with SCID. We partnered with the National Institutes of Health (the "NIH") and Stanford University in several investigator sponsored trials for patients with a variety of diseases undergoing hematopoietic stem cell transplant.

38. Further, in discussing the Company's strategy, the 2023 10-K stated, in relevant part:

> Our goal is to develop and commercialize briquilimab as a safe and efficacious therapeutic to address the significant unmet medical need for patients suffering from mast cell driven diseases such as CSU and CIndU. As part of our strategy, we aim to:
>
> Build a leading biotechnology company to enable cures via immune modulation. We are bringing together a team of biotech veterans, leading academic institutions and a strong syndicate of healthcare-focused investors to achieve our vision of developing and commercializing therapeutics with a focus on mast cell driven diseases.
>
> Advance the development of briquilimab as a chronic therapeutic targeted primarily at mast cell driven diseases. We are focused on developing briquilimab as a repeat dose therapy for disorders of mast cells, including CSU, CIndU and additional mast cell driven indications currently under pre-clinical evaluation utilizing our proprietary Jasper Mouse.
>
> * * *
>
> Commercialize our product candidates to expand the use of effective and safe mast cell therapies for patients and physicians in our target markets. If approved, we plan to bring our product candidates to the American, European and Japanese markets, focusing on the top physicians and accredited transplant centers and hospital-based prescribers who administer the majority of mast cell therapies.

39. Appended to the 2023 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Martell and Cross attesting that "[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

40. On May 13, 2024, the Company issued a press release entitled "Jasper Therapeutics Announces Briquilimab Development Program in Asthma." The press release stated, in relevant part:

> "Asthma remains a devastating chronic disease affecting millions of patients in the US despite current treatment options," said [Defendant] Martell[.] "We believe that briquilimab's ability to deplete mast cells in the lung may have a significant impact on disease control across all types of asthma, including patients who are not indicated for current biologic agents or who remain refractory to them. Clinical proof of concept for the efficacy of c-Kit inhibition in asthma has been previously established with older, less specific c-Kit inhibitors, and we are excited bring the first anti-c-Kit antibody into human studies. With the anticipated launch of the Phase 1b/2a study later this year, we plan to present clinical data in the second half of 2025. This trial, along with our ongoing clinical studies in chronic spontaneous and chronic inducible urticarias, is the latest step in our goal of realizing briquilimab's therapeutic potential across numerous mast cell driven diseases affecting tens of millions of patients worldwide."

41. On May 14, 2024, Jasper issued a press release announcing the Company's Q1 2024 financial results. The press release stated, in relevant part:

> "We have continued to make strong progress advancing briquilimab during the first few months of the year," said [Defendant] Martell[.] "The BEACON and SPOTLIGHT studies in chronic urticarias are rapidly enrolling patients and we remain on track to disclose initial data from the studies in the third quarter of 2024 and second half of 2024, respectively. In addition, we recently announced our intention to advance briquilimab into clinical development in asthma, an indication in which we believe mast cell depletion via c-Kit inhibition has the potential to significantly impact disease control across all subtypes of the disease. With multiple clinical data readouts on the horizon in addition to the launch of our asthma development program, we are looking forward to an exciting and milestone rich second half of the year."

42. On August 13, 2024, Jasper issued a press release announcing the Company's Q2 2024 financial results. The press release stated, in relevant part:

> "We have continued to make excellent progress advancing briquilimab during the second quarter, with patient enrollment proceeding faster than initially expected in the BEACON and SPOTLIGHT studies," said [Defendant] Martell[.] "The strong rate of enrollment has given us the opportunity to include additional cohorts in our initial CSU data readout, and we are now planning to present results from dosing cohorts up to 240mg in the fourth quarter of this year. While the company remains blinded to efficacy data from the study, rapid enrollment in BEACON has also given us the flexibility to expand the study to include an additional dosing cohort evaluating briquilimab at 180mg Q8W. This will enable us to generate a more robust dataset to support dose selection for our planned registrational trials in CSU without impacting their timelines." "We are

> very pleased with the progress in the BEACON and SPOTLIGHT studies thus far," said [Defendant] Tucker[.] "With the support of our investigators, the efforts of the Jasper team and the timely review and approval by the Independent Data Monitoring Committee (IDMC) we have been able to quickly proceed through dose escalation on the BEACON study and are now enrolling patients at the highest dose, 240mg. This rapid progress and safety affirmation by the IDMC has enabled expansion of the BEACON study to obtain more clinical insights into the potential benefits of briquilimab for patients with CSU, without delaying the program. We look forward to reviewing and presenting initial data from both the BEACON and SPOTLIGHT studies later this year, followed in early 2025 by the full study reports to be presented at a medical conference."

43. On September 10, 2024, the Company issued a press release entitled "Jasper Therapeutics Announces Health Canada Clearance of Clinical Trial Application for Phase 1b/2a Study of Briquilimab in Asthma." The press release stated, in relevant part:

> "We are excited to announce that Health Canada has issued a no objection letter allowing us to move forward with our first clinical trial evaluating briquilimab in asthma, and we look forward to commencing patient enrollment shortly," said [Defendant] Tucker[.] "Our clinical development plan follows an established and efficient pathway beginning with a challenge study in patients with allergic asthma to enable rapid advancement of the program. We aim to demonstrate proof of concept for the depletion of mast cells with briquilimab as an effective mechanism of action in asthma and to inform potential future studies in the broader asthma population."

* * *

> "Clearance of the CTA for the asthma study is an important milestone for Jasper as we continue to build out our pipeline of programs evaluating briquilimab in mast cell driven diseases," said [Defenadnt] Martell[.] "Being able to move directly to a 180mg dose in this study as a result of the dose escalation in the BEACON study is an excellent outcome as we believe that driving deep depletion of mast cells in the airways with a higher dose of briquilimab will be key to demonstrating durable clinical benefit in asthma patients."

44. On November 7, 2024, Jasper issued a press release announcing the Company's Q3 2024 financial results. The press release stated, in relevant part:

> "We achieved several significant milestones in our mast cell development programs in recent months, highlighted by positive initial data from our SPOTLIGHT study in CIndU," said [Defendant] Martell[.] "We were very excited to present our first dataset evaluating briquilimab in a mast cell disease, which showed that over 90% of patients treated in the 40mg and 120mg dose cohorts achieved a clinical response, with no serious adverse events (SAEs) and no grade 3 or higher adverse events (AEs) reported. We also made significant progress advancing our development programs in

> chronic urticaria and asthma with the addition of higher dose cohorts in the BEACON and SPOTLIGHT studies as well as the attainment of regulatory clearance in Canada and the EU for our asthma challenge study. We are looking forward to our next major milestone with the presentation of initial data from the BEACON study expected during the week of January 6th, 2025."

45. On December 2, 2024, the Company issued a press release entitled "Jasper Therapeutics Announces First Patient Dosed in Phase 1b/2a ETESIAN Clinical Study of Briquilimab in Asthma." The press release stated, in relevant part:

> "Dosing of the first patient in our ETESIAN study in asthma is a significant milestone, marking our third clinical program evaluating briquilimab in an inflammatory disease driven by unwanted mast cell activity," said [Defendant] Tucker[.] "Following dose escalation through Part 2 of the BEACON study in CSU, we obtained regulatory clearance to move directly to a subcutaneous 180mg dose in the ETESIAN study, which we believe will drive deep mast cell depletion in the airways and enable durable clinical benefit for patients with asthma. We look forward to providing enrollment updates as we progress through the study and anticipate reporting the initial data in the second half of 2025."

46. On January 8, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Positive Data from BEACON Study of Briquilimab in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

> "We are very pleased to present the positive preliminary data from the BEACON study, which demonstrates the potential of briquilimab as a leading therapeutic for CSU patients," said [Defendant] Tucker[.] "The profound reduction in UAS7 from baseline in multiple cohorts, the dose dependent durability of response and the significant and prolonged drops in mean serum tryptase from baseline demonstrate the potential for deep and durable efficacy of briquilimab in CSU. Combined with the favorable safety profile enabled by our optimal biologic dosing approach, we believe briquilimab has demonstrated the potential to be a leading therapeutic option for patients with CSU. On behalf of the entire Jasper team, I'd like to thank the investigators and the patients who are participating in the study, along with their families and caregivers."

47. On February 27, 2025, Jasper issued a press release announcing the Company's Q4 and full year 2024 financial results. The press release stated, in relevant part:

> "The past year has been a transformational period for Jasper, highlighted by positive data readouts from the BEACON study in CSU and the SPOTLIGHT study in CIndU, our first two clinical studies evaluating Briquilimab in mast cell diseases," said [Defendant] Martell[.] "Data from both studies demonstrate the ability of briquilimab to drive rapid and deep response profiles in patients with chronic urticaria, along with the potential for a favorable and differentiated safety profile. We believe the preliminary

> results from the BEACON study support advancing briquilimab into a pivotal program in CSU beginning with an operationally adaptive Phase 2b study that we expect to commence later this year. Final dose selection for the Phase 2b study will be further informed by a substantial array of additional clinical data at doses of 180mg and higher coming mid-year, including results from approximately 40 additional patients in the BEACON study and SPOTLIGHT study, as well as results from approximately 30 patients in the open-label extension study."

48. On February 28, 2025, Jasper filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K contained a substantively similar discussion of briquilimab and the Company's strategy as discussed, supra, in ¶¶ 37-38.

49. Appended to the 2024 10-K as an exhibit was a signed certification pursuant to SOX by Defendants Martell and Cross attesting that "[t]he information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50. On May 12, 2025, Jasper issued a press release announcing the Company's Q1 2025 financial results. The press release stated, in relevant part:

> "***During the first quarter of 2025 we made great progress advancing briquilimab toward important data readouts later this year from all three of our clinical programs in mast cell diseases***," said [Defendant] Martell[.] "Updated data from the BEACON study in CSU presented at the AAAAI annual meeting continued to demonstrate the potential of briquilimab to deliver differentiated onset of action, depth of response, and tolerability. We look forward to our mid-year data update in the first half of Q3 2025, which will include additional CSU patients treated in the BEACON study and in the open-label extension study. These data will inform final dose selection for our planned Phase 2b study, expected to commence in the fourth quarter of 2025. We also remain on track to present additional data from the SPOTLIGHT study in CIndU in the second quarter as well as initial data from the ETESIAN study in asthma in the second half of 2025."

51. These statements were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Jasper lacked the controls and procedures necessary to ensure that the third-party manufacturers on which it relied were manufacturing products in full accordance with

cGMP regulations and otherwise suitable for use in clinical trials; (ii) the foregoing failure increased the risk that results of ongoing studies would be confounded, thereby negatively impacting the regulatory and commercial prospects of the Company's products, including briquilimab; (iii) the foregoing increased the likelihood of disruptive cost-reduction measures; (iv) accordingly, the Company's business and/or financial prospects, as well as briquilimab's clinical and/or commercial prospects, were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**C. The Truth is Revealed**

52. On July 7, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Clinical Data Update from Briquilimab Studies in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

> Jasper [. . .] is reporting updated data from Company's BEACON Phase 1b/2a study of subcutaneous briquilimab in adult participants with CSU and providing an update on the program. Briquilimab administration resulted in deep and rapid disease control in the 240mg and 360mg single-dose cohorts, with 8 of 9 (89%) of participants enrolled across both cohorts achieving a complete response, and with 7 of 9 (78%) achieving a clinical response by week 2. In addition, BEACON participants who rolled over into the open-label extension study dosing at 180mg Q8W demonstrated robust clinical efficacy with 8 of 11 (73%) participants achieving a complete response at 12 weeks.
>
> Results from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts appear to be confounded by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with drug from the lot in question. The Company is investigating the drug product lot in question and expects to have the results of that investigation in the coming weeks. Key observations noted in those 10 patients were lower than expected drops in mean tryptase levels and no discernable impact on UAS7 scores. The 2 participants enrolled in the cohorts that have been confirmed as being dosed with drug product from a different lot both achieved complete response.
>
> * * *
>
> The Company has also determined that the drug product lot in question was used to treat participants enrolled in the ETESIAN trial evaluating briquilimab in asthma. As a result, and in order to focus resources on advancing briquilimab in CSU, the Company is halting the study and pausing development in asthma. In addition, the Company is halting development in SCID and will be implementing a number of other cost

cutting measures, including a potential restructuring, to extend runway and reduce expenses.

"We were pleased that results from the 240mg and 360mg single dose cohorts continue to indicate that briquilimab treatment can lead to deep and durable disease control in patients with CSU," said [Defendant] Martell[.] "We are also very excited by the performance of the 180mg Q8W dose in the open label extension study with the strong efficacy observed, in combination with the encouraging safety data, supporting a differentiated profile. While we are very disappointed by the confounded results seen in the two multi-dose cohorts of the BEACON study, we are currently investigating the cause and are taking steps to ensure that drug product from the lot in question is returned to the Company and that sites have drug product from other lots to continue dosing. We plan to enroll an additional 10-12 patients across the two impacted cohorts to inform final dose selection for the Phase 2b study, and will be implementing a number of cost cutting measures to reduce burn and extend our cash runway in light of this delay."

53. Market analysts were quick to comment on the Company's announcement. For example, on July 7, 2025, BMO Capital Markets published a report entitled "Downgrade to Mkt; Manuf Issue Adds High Uncertainty to an Already Ambiguous Story." The BMO Report stated, in relevant part:

Bottom Line:

Management update on Briquilimab's CSU trial includes: (1) 240mg/360mg single-dose data suggesting plateauing exposure/efficacy; (2) 240mg and 240mg/180mg Q8W efficacy/safety data, likely confounded by product lot issues; (3) Preliminary 180mg Q8W OLE data, in line with blinded data. Although the new data appear somewhat encouraging, the potential manufacturing issue, and underlying uncertainty/questions, make it challenging to separate the signal from the noise. Given the market environment and previous setback here, we believe investors won't feel comfortable coming back to the story following today's update. Downgrading to Market Perform, PT to $4.

54. On this news, Jasper's stock price fell $3.73 per share, or 55.1%, to close at $3.04 per share on July 7, 2025.

55. On July 9, 2025, Jasper issued a press release announcing a corporate reorganization to cut costs at the Company. According to the press release:

**Jasper Therapeutics Announces Corporate Reorganization and Other Cost Cutting Measures to Extend Cash Runway**

*Reducing workforce by approximately 50% to focus on Chronic Urticaria programs and extend cash runway*

*Dr. Edwin Tucker departing as Chief Medical Officer; Dr. Daniel Adelman to serve as Acting Chief Medical Officer*

**REDWOOD CITY, Calif., July 9, 2025 (GLOBE NEWSWIRE)** – Jasper Therapeutics, Inc. (Nasdaq: JSPR) (Jasper), a clinical stage biotechnology company focused on development of briquilimab, a novel antibody therapy targeting KIT (CD117) to address mast cell driven diseases such as chronic spontaneous urticaria (CSU) and chronic inducible urticaria (CIndU), today announced a corporate reorganization to extend its cash runway, including a workforce reduction of approximately 50%. As part of the reorganization, Edwin Tucker, M.D., is departing as Jasper's Chief Medical Officer, and Daniel Adelman, M.D., a member of Jasper's Scientific Advisory Board, will assume the role of Acting Chief Medical Officer. In order to focus resources on the development of briquilimab in chronic urticaria, Jasper is halting its other clinical and preclinical programs.

"While we are taking steps to significantly streamline our operations, we remain committed to the development of briquilimab in chronic urticaria, where we have seen rapid, deep and durable responses along with a favorable safety profile in both CSU and CIndU," said Ronald Martell, President and Chief Executive Officer of Jasper. "We look forward to sharing additional data from the BEACON and open label extension studies later this year. While it is very difficult to part with so many talented and valued members of our team, we view this as a necessary step to ensure we closely manage our capital to execute on our mission to deliver a differentiated therapeutics option to patients in need. I'd like to thank those leaving Jasper for their important contributions to the company, and in particular, I'd like to thank Dr. Tucker for his leadership as we advanced briquilimab into multiple clinical studies in mast cell diseases."

**Corporate Updates and Revised Guidance**

- Jasper has refined its operating plan to focus on its briquilimab programs in chronic urticaria, and as a result has executed a workforce reduction of approximately 50% of its current employees.
- In order to focus on developing briquilimab in chronic urticaria and completing the BEACON, SPOTLIGHT and open label extension studies, Jasper is halting its other clinical and preclinical programs, including the ETESIAN study in asthma, the SCID study and the ongoing investigator-sponsored studies. Jasper no longer plans to initiate additional mast cell focused clinical development program this year.
- Dr. Edwin Tucker is departing his role as Chief Medical Officer effective August 1, 2025. Dr. Daniel Adelman, an experienced clinical development executive and member of Jasper's scientific advisory board, will assume the role of Acting Chief Medical Officer as of that date.

**D. Defendants' Misconduct Has and Continues to Harm the Company**

56. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Grant v. Jasper Therapeutics, Inc. et al.*, Case No.: 5:25-cv-08010-BLF (N. D. Cal.) (the "Securities Class Action"), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

57. Jasper's reputation and goodwill have also been damaged by the Defendants' misconduct.

**E. Jasper Issues False and Misleading Proxy Statements**

58. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statement issued on April 22, 2024 (the "2024 Proxy") and the Schedule 14A Proxy Statement issued on May 19, 2025 (the "2025 Proxy") that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

59. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy and the 2025 Proxy before they were filed with the SEC and disseminated to Jasper's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies' allegations and related claims.

60. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

**Corporate Governance Guidelines and Code of Business Conduct and Ethics**

Our Board has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. Our code of business conduct and ethics is available under the "Investors-Corporate Governance" section of our website at ir.jaspertherapeutics.com/corporate-governance/documents-charters. In addition, we intend to post on our website all disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the code. The reference to our website address does not constitute incorporation by reference of the information contained in or available or accessible through our website, and you should not consider it to be a part of this Proxy Statement.

**Risk Management**

Management is responsible for the day-to-day management of risks we face, while our Board, as a whole and assisted by its committees, is responsible for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

Our Board is responsible for risk oversight. Our Board believes that it is essential for effective risk management and oversight that there be open communication between management and our Board. Our Board meets with our Chief Executive Officer, Chief Financial Officer and other members of the senior management team at quarterly meetings of our Board, where, among other topics, they discuss strategy and risks facing us, as well as at such other times as they deemed appropriate.

Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting, accounting, tax disclosure controls and procedures, enterprise risk and legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial, cybersecurity and information technology risk exposures and the steps management has taken to monitor and control these exposures. Our Audit Committee also monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk. Our Compensation Committee assesses risks created by the incentives inherent in our compensation policies and evaluates our compensation policies and practices that could mitigate any such risks. Our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with board organization, membership and structure, and environmental, social and corporate governance matters. Our full Board also reviews

> strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at regular meetings of our Board, and evaluates the risks inherent in significant transactions.

61. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

> **Corporate Governance Guidelines and Code of Business Conduct and Ethics**
>
> Our Board has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. Our code of business conduct and ethics is available under the "Investors-Corporate Governance" section of our website at ir.jaspertherapeutics.com/corporate-governance/documents-charters. In addition, we intend to post on our website all disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the code. The reference to our website address does not constitute incorporation by reference of the information contained in or available or accessible through our website, and you should not consider it to be a part of this Proxy Statement.
>
> **Risk Management**
>
> Management is responsible for the day-to-day management of risks we face, while our Board, as a whole and assisted by its committees, is responsible for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed. Our Board is responsible for risk oversight. Our Board believes that it is essential for effective risk management and oversight that there be open communication between management and our Board. Our Board meets with our Chief Executive Officer, Chief Financial Officer and other members of the senior management team at quarterly meetings of our Board, where, among other topics, they discuss strategy and risks facing us, as well as at such other times as they deemed appropriate.
>
> Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting, accounting, tax disclosure controls and procedures, enterprise risk and legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial, cybersecurity and information technology risk exposures and the steps management has taken to monitor and control these exposures. Our Audit Committee also monitors certain key risks on a regular basis throughout the fiscal year, such as risk

> associated with internal control over financial reporting and liquidity risk. Our Compensation Committee assesses risks created by the incentives inherent in our compensation policies and evaluates our compensation policies and practices that could mitigate any such risks. Our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with board organization, membership and structure, and environmental, social and corporate governance matters. Our full Board also reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at regular meetings of our Board, and evaluates the risks inherent in significant transactions.

62. The Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning Jasper.

63. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F. The Board Breached its Fiduciary Duties**

64. As officers and/or directors of Jasper, the Defendants owed Jasper fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Jasper in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Jasper, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

65. Defendants, because of their positions of control and authority as directors and/or officers of Jasper, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the

Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Jasper's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

66. To discharge their duties, the officers and directors of Jasper were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Jasper were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such

conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

67. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

68. The Board's Audit Committee is tasked with overseeing Jasper's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Jasper's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- ***Audited Financial Statement Review***. To review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, and to recommend whether or not such financial statements should be so included. Further, auditing literature, particularly Statement on Auditing Standards No. 100 (AU Section 722), defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this Charter is not intended to have that meaning and should not be interpreted to suggest that the Committee members can or should follow the procedures required of auditors performing reviews of financial statements.

- ***Quarterly Results***. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure

of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Reports on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted accounting standards, including the standards of the PCAOB.

- ***Press Releases***. To review and discuss with management and the Auditors, as appropriate, earnings press releases and press releases containing other financial information or results of operations, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson may represent the entire Committee for purposes of this discussion. To the extent practicable, the Committee shall be furnished with an advance copy of each earnings release for its review prior to publication.

69. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants von Emster, Kapoor, and Nolet conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

70. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

71. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Jasper.

**DERIVATIVE ALLEGATIONS**

72. Plaintiff brings this action derivatively in the right and for the benefit of Jasper to redress injuries suffered by Jasper as a direct result of the Director Defendants' breaches of fiduciary duty. Jasper is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73. Plaintiff will adequately and fairly represent the interests of Jasper in enforcing and prosecuting the Company's rights.

74. Plaintiff was a stockholder of Jasper at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Jasper stockholder.

**DEMAND FUTILITY ALLEGATIONS**

75. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

76. The Jasper Board currently has eight members: Defendants Martell, Shizuru, Von Emster, Nolet, Brun, Kapoor, Wiggans, and Lucas.

77. Plaintiff has not made any demand on Jasper's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

78. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due

diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

79. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of the Company. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Martell**

80. Defendant Martell is the Company's CEO. Defendant Martell received compensation of $727,272.00 in 2024. Defendant Martell depends on Jasper for his income. In addition, Jasper stated in the 2025 Proxy that Defendant Martell is not independent pursuant to the rules and requirements of Nasdaq and the SEC.

81. Defendant Martell served as a director of the Company during the Relevant Time Period. As a director, Defendant Martell had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Martell was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

82. Defendant Martell failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Martell failed to protect corporate assets.

83. Defendant Martell was an active participant in the misconduct described above. Defendant Martell signed the 2023 10-K, the 2024 10-K, and the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Martell made false and misleading statements concerning Jasper. Defendant Martell therefore faces a substantial likelihood of liability.

84. In addition, Defendant Martell is a named defendant in the Securities Class Action.

85. Thus, Defendant Martell faces a substantial likelihood of liability, making any demand on Defendant Martell futile.

**B. Demand is Excused as to Defendant Shizuru**

86. Defendant Shizuru served as a director of the Company during the Relevant Time Period. As a director, Defendant Shizuru had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Shizuru was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

87. Defendant Shizuru failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Shizuru failed to protect corporate assets.

88. According to the 2025 Proxy, Defendant Shizuru received $457,789.00 in compensation in connection with her role as a Company director. Accordingly,

Defendant Shizuru cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

89. In addition, Jasper stated in the 2025 Proxy that Defendant Shizuru is not independent pursuant to the rules and requirements of Nasdaq and the SEC.

90. Defendant Shizuru was an active participant in the misconduct described above. Defendant Shizuru signed the 2023 10-K and the 2024 10-K. Defendant Shizuru therefore faces a substantial likelihood of liability.

91. Defendant Shizuru knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Shizuru breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Shizuru faces a substantial likelihood of liability for these breaches, making any demand on Defendant Shizuru futile.

**C. Demand is Excused as to Defendant von Emster**

92. Defendant von Emster served as a director of the Company during the Relevant Time Period. As a director, Defendant von Emster had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant von Emster was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

93. Defendant von Emster failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant von Emster failed to protect corporate assets.

94. According to the 2025 Proxy, Defendant von Emster received $228,289.00 in compensation in connection with his role as a Company director. Accordingly,

Defendant von Emster cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

95. Defendant von Emster was an active participant in the misconduct described above. Defendant von Emster signed the 2023 10-K and the 2024 10-K. Defendant von Emster therefore faces a substantial likelihood of liability.

96. Defendant von Emster knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant von Emster breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant von Emster faces a substantial likelihood of liability for these breaches, making any demand on Defendant von Emster futile.

97. Defendant von Emster served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing and discussing with management the Company's annual and quarterly financial statements, as well as press releases containing financial information or results of operations. The Audit Committee was thus responsible for reviewing and approving Jasper's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant von Emster was thus responsible for knowingly or recklessly allowing the improper statements related to Jasper's oversight of third-party manufacturers and the actual prospects for the Company and briquilimab. In doing so, Defendant von Emster knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant von Emster breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant von Emster faces a substantial likelihood of liability for these breaches, making any demand on Defendant von Emster futile.

**D. Demand is Excused as to Defendant Nolet**

98. Defendant Nolet served as a director of the Company during the Relevant Time Period. As a director, Defendant Nolet had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its

business, operations, prospects, internal controls, and financial statements were accurate. Defendant Nolet was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

99. Defendant Nolet failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Nolet failed to protect corporate assets.

100. According to the 2025 Proxy, Defendant Nolet received $226,489.00 in compensation in connection with his role as a Company director. Defendant Nolet is not otherwise employed. Accordingly, Defendant Nolet cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

101. Defendant Nolet was an active participant in the misconduct described above. Defendant Nolet signed the 2023 10-K and the 2024 10-K. Defendant Nolet therefore faces a substantial likelihood of liability.

102. Defendant Nolet knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Nolet breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Nolet faces a substantial likelihood of liability for these breaches, making any demand on Defendant Nolet futile.

103. Defendant Nolet served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing and discussing with management the Company's annual and quarterly financial statements, as well as press releases containing financial information or results of operations. The Audit Committee was thus responsible for reviewing and approving Jasper's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Nolet was thus responsible for knowingly or recklessly allowing the improper statements related to Jasper's oversight of third-

party manufacturers and the actual prospects for the Company and briquilimab. In doing so, Defendant Nolet knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Nolet breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Nolet faces a substantial likelihood of liability for these breaches, making any demand on Defendant Nolet futile.

**E. Demand is Excused as to Defendant Brun**

104. Defendant Brun served as a director of the Company during the Relevant Time Period. As a director, Defendant Brun had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Brun was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

105. Defendant Brun failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Brun failed to protect corporate assets.

106. According to the 2025 Proxy, Defendant Brun received $217,789.00 in compensation in connection with his role as a Company director. Accordingly, Defendant Brun cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

107. Defendant Brun was an active participant in the misconduct described above. Defendant Brun signed the 2023 10-K and the 2024 10-K. Defendant Brun therefore faces a substantial likelihood of liability.

108. Defendant Brun knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Brun breached the fiduciary duty

of loyalty and good faith by participating in the misconduct described above. Defendant Brun faces a substantial likelihood of liability for these breaches, making any demand on Defendant Brun futile.

**F. Demand is Excused as to Defendant Kapoor**

109. Defendant Kapoor served as a director of the Company during the Relevant Time Period. As a director, Defendant Kapoor had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Kapoor was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

110. Defendant Kapoor failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Kapoor failed to protect corporate assets.

111. According to the 2025 Proxy, Defendant Kapoor received $217,789.00 in compensation in connection with his role as a Company director. Accordingly, Defendant Kapoor cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

112. Defendant Kapoor was an active participant in the misconduct described above. Defendant Kapoor signed the 2023 10-K and the 2024 10-K. Defendant Kapoor therefore faces a substantial likelihood of liability.

113. Defendant Kapoor knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Kapoor breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Kapoor faces a substantial likelihood of liability for these breaches, making any demand on Defendant Kapoor futile.

114. Defendant Kapoor served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing and discussing with management the Company's annual and quarterly financial statements, as well as press releases containing financial information or results of operations. The Audit Committee was thus responsible for reviewing and approving Jasper's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Kapoor was thus responsible for knowingly or recklessly allowing the improper statements related to Jasper's oversight of third-party manufacturers and the actual prospects for the Company and briquilimab. In doing so, Defendant Kapoor knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Kapoor breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Kapoor faces a substantial likelihood of liability for these breaches, making any demand on Defendant Kapoor futile.

**G. Demand is Excused as to Defendant Wiggans**

115. Defendant Wiggans served as a director of the Company during the Relevant Time Period. As a director, Defendant Wiggans had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Wiggans was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

116. Defendant Wiggans failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Wiggans failed to protect corporate assets.

117. According to the 2025 Proxy, Defendant Wiggans received $231,489.00 in compensation in connection with his role as a Company director. Defendant Wiggans is

not otherwise employed. Accordingly, Defendant Wiggans cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

118. Defendant Wiggans was an active participant in the misconduct described above. Defendant Wiggans signed the 2023 10-K and the 2024 10-K. Defendant Wiggans therefore faces a substantial likelihood of liability.

119. Defendant Wiggans knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Wiggans breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Wiggans faces a substantial likelihood of liability for these breaches, making any demand on Defendant Wiggans futile.

**H. Demand is Excused as to Defendant Lucas**

120. Defendant Lucas served as a director of the Company during the Relevant Time Period. As a director, Defendant Lucas had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Lucas was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

121. Defendant Lucas failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Jasper's controls, Defendant Lucas failed to protect corporate assets.

122. According to the 2025 Proxy, Defendant Lucas received $324,034.00 in compensation in connection with her role as a Company director. Accordingly, Defendant Lucas cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

123. Defendant Lucas was an active participant in the misconduct described above. Defendant Lucas signed the 2024 10-K. Defendant Lucas therefore faces a substantial likelihood of liability.

124. Defendant Lucas knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Lucas breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Lucas faces a substantial likelihood of liability for these breaches, making any demand on Defendant Lucas futile.

125. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

**Breach of Fiduciary Duty**
**(Derivatively Against The Director Defendants)**

126. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127. Each of the Director Defendants owed and owes Jasper the highest obligations of loyalty, good faith, due care, and oversight.

128. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

129. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

130. In addition, the Director Defendants further breached their fiduciary duties owed to Jasper by willfully or recklessly making and/or causing the Company to make

false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that: (i) Jasper lacked the controls and procedures necessary to ensure that the third-party manufacturers on which it relied were manufacturing products in full accordance with cGMP regulations and otherwise suitable for use in clinical trials; (ii) the foregoing failure increased the risk that results of ongoing studies would be confounded, thereby negatively impacting the regulatory and commercial prospects of the Company's products, including briquilimab; (iii) the foregoing increased the likelihood of disruptive cost-reduction measures; (iv) accordingly, the Company's business and/or financial prospects, as well as briquilimab's clinical and/or commercial prospects, were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

131. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

132. As a direct and proximate result of the breaches of duty alleged herein, Jasper has sustained and will sustain significant damages.

133. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

134. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

135. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

136. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Jasper the highest obligations of loyalty, good faith, due care, oversight, and candor.

137. The Officer Defendants breached their fiduciary duties owed to Jasper by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that: (i) Jasper lacked the controls and procedures necessary to ensure that the third-party manufacturers on which it relied were manufacturing products in full accordance with cGMP regulations and otherwise suitable for use in clinical trials; (ii) the foregoing failure increased the risk that results of ongoing studies would be confounded, thereby negatively impacting the regulatory and commercial prospects of the Company's products, including briquilimab; (iii) the foregoing increased the likelihood of disruptive cost-reduction measures; (iv) accordingly, the Company's business and/or financial prospects, as well as briquilimab's clinical and/or commercial prospects, were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

138. As a direct and proximate result of the breaches of duty alleged herein, Jasper has sustained and will sustain significant damages.

139. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

140. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

**COUNT III**
**Gross Mismanagement**
**(Derivatively Against All Defendants)**

141. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

143. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

144. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Jasper has sustained and will sustain significant damages.

145. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

146. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

147. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

148. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the

Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

149. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

150. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Jasper has sustained significant damages.

151. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

152. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

## COUNT V
## Unjust Enrichment
## (Derivatively Against the Officer Defendants)

153. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

154. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

155. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

156. Plaintiff, on behalf of Jasper, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any

performance-based or valuation based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI
## Violation of Section 14(a) of the Exchange Act
## (Derivatively Against The Director Defendants)

157. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

158. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

159. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy and the 2025 Proxy. In the 2024 Proxy and the 2025 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

160. The 2024 Proxy and the 2025 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Jasper misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

161. Plaintiff, on behalf of Jasper, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy and the misleading 2025

Proxy in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Jasper and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Jasper for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Jasper restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 22, 2025 *By: /s/ Francis J. "Casey" Flynn, Jr.*

Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: *casey@lawofficeflynn.com*

**ROWLEY LAW PLLC**

Shane T. Rowley, Esq.
Danielle Rowland Lindahl, Esq.
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Counsel for Plaintiffs*